IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:03-CV-244-FL

| | |
|---|---|
| HILARIE G. SCARBRO, Administratrix of the Estate of Gary Eugene Rummer, ) ) ) ) | |
| Plaintiff, ) ) | ORDER |
| v. ) ) | |
| NEW HANOVER COUNTY, et al., ) ) | |
| Defendants. ) | |

This matter comes before the court upon motion of defendant B.R. Hudson ("Hudson") to bifurcate trial (DE # 160) and to use special interrogatories to resolve the issue of qualified immunity at trial (DE # 162). Plaintiff has responded to these motions, and Hudson has replied.[1] In this posture, the issues raised are ripe for adjudication. For the reasons that follow, the motion to bifurcate is DENIED and the motion to use special interrogatories is GRANTED.

## BACKGROUND

This case is before the court for trial following remand by the Fourth Circuit Court of Appeals. See Scarbro v. New Hanover Cnty., 374 F. App'x 366 (4th Cir. 2010) (unpublished). Plaintiff is the administratrix of the estate of Gary Eugene Rummer ("Rummer"), who died on January 16, 2003, while in the custody of the New Hanover County Sheriff's Department. Plaintiff

---

[1] Hudson's reply to plaintiff's response regarding the motion to bifurcate was not timely filed. It appears that Hudson measured his reply time from the date plaintiff corrected her filing to bring it into compliance with Section L of the court's CM/ECF Policy and Procedures Manual rather than the date the filing was actually served on him. Nevertheless, because Hudson's tardiness appears unintentional, the court will consider his untimely reply.

filed a number of claims initially, but the only claim remaining for trial is plaintiff's inadequate medical care claim under 42 U.S.C. § 1983 against Hudson. See Order On Issues Remaining For Trial [DE 154] at 5. Also remaining for trial is consideration of Hudson's asserted defense of qualified immunity. Id. at 8-9.

On May 4, 2011, Hudson filed a motion to bifurcate the issues of liability and damages at trial so that the issue of his entitlement to qualified immunity may be tried first. Hudson contends that there is little overlap between these two issues, that he would suffer prejudice absent bifurcation, and that resolution of the qualified immunity issue in his favor during the first stage of the trial would eliminate the need for further litigation on the issue of damages. Plaintiff, responding in opposition, argues that bifurcation is not appropriate because it would violate her right to due process and a fair trial, and risks prolonging the trial if the qualified immunity issue is *not* resolved in favor of Hudson. Moreover, plaintiff contends that, contrary to Hudson's argument, there is overlap in the evidence between liability and damages.

On May 5, 2011, Hudson filed a motion requesting that the court submit special interrogatories to the jury to resolve the issue of his entitlement to qualified immunity. Suggested interrogatories accompany his motion. In plaintiff's response, she agrees that the court should submit special interrogatories to the jury, but disagrees as their content and/or wording. As such, plaintiff has submitted her own suggested interrogatories.

**DISCUSSION**

A.  Bifurcation

The court may order separate trial of one or more issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ." Fed. R. Civ. P. 42(b). The court is given "wide

Case 7:03-cv-00244-FL   Document 170   Filed 06/27/11   Page 2 of 11

latitude" in determining whether bifurcation is appropriate, and its exercise of discretion will be overturned only if clearly abused. See Dixon v. CSX Transp., Inc., 990 F.2d 1440, 1443-45 (4th Cir. 1993). Because "the bifurcation of issues and the separate trial of them is not the usual course of events[,] . . . [and] a single trial will [generally] be more expedient and efficient," the burden is on the moving party to show circumstances meriting exercise of the court's discretion. See F&G Scrolling Mouse, LLC v. IBM Corp., 190 F.R.D. 385, 387 (D. Md. 1999).

1. Timing of Qualified Immunity Inquiry

Hudson's argument focuses heavily on the Supreme Court's statements regarding the importance of resolving qualified immunity questions "at the earliest possible stage in litigation," see Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam), and of sparing officers "unwarranted demands customarily imposed upon those defending a long drawn out lawsuit," see Siegert v. Gilley, 500 U.S. 226, 232 (1991). Hudson compares an advance trial on the issue of liability or qualified immunity to the ability of a defendant to limit summary judgment discovery to that "tailored specifically to the question of . . . qualified immunity." See Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987). Finally, he argues that the procedure set forth by the Fourth Circuit in Willingham v. Crooke, 412 F.3d 553 (4th Cir. 2005), discussed below, all but compels bifurcation.

The court is not convinced. Early resolution of qualified immunity justifies withholding discovery while the court considers a motion to dismiss on that basis and, if dismissal is not warranted, allowing only limited discovery for purposes of summary judgment on the immunity question. But once it is clear that such early resolution is impossible, trial is necessary, and it is assumed that "a single trial will be more expedient" than separate trials. See F&G Scrolling Mouse, LLC, 190 F.R.D. at 387. Indeed, Hudson has provided *no* example of case in which a court

3

bifurcated the issue of qualified immunity or liability from that of damages; the only such example comes from plaintiff, who cites a Sixth Circuit case in which that court found that the trial court abused its discretion in engaging in such bifurcation. See Martin v. Heideman, 106 F.3d 1308, 1311-12 (6th Cir. 1997).[2]

Additionally, the court does not agree that Willingham supports Hudson's argument for bifurcated trials. In Willingham, the Fourth Circuit, noting that resolution of a genuine issue of material fact regarding whether the alleged constitutional violation occurred must be reserved for the jury, held that denial of summary judgment on grounds that a genuine issue of material facts exists does not preclude a defendant from raising the issue of qualified immunity at trial. See 412 F.3d at 559. The court went on to hold that "the legal question of a defendant's entitlement to qualified immunity under [the] particular set of facts [found by the jury] should be decided by the court, not by the jury." Id. at 560. But nothing in Willingham mentions a more than one trial to determine those facts.

2. Overlapping Evidence

Hudson also argues that there would be no significant overlap of evidence between the liability and damages trials. He notes that liability turns on facts pertinent to Rummer's injury, including whether the injury was objectively serious, whether Hudson knew of the serious nature of this injury, and whether he acted with deliberate indifference to the injury. See Scarbro, 374 F. App'x at 370-71. By contrast, Hudson contends that, pursuant to North Carolina law, the issue of

---

[2] Although Martin is distinguishable on its facts from this case, it is still telling that the *only* decision cited by either party regarding bifurcation of the qualified immunity issue resulted in a finding that the district court abused its discretion. See also Domingue v. Lafayette City Parish Consol. Gov't, 2008 WL 728654, at *23 & n.46 (W.D. La. Mar. 17, 2008) (declining to bifurcate trial in order to first consider qualified immunity defense where "no party . . . briefed the issue of bifurcation in the specific context of a civil rights case involving qualified immunity" and the court believed bifurcation of the issue might be "in contravention of Fifth Circuit law").

4

Case 7:03-cv-00244-FL   Document 170   Filed 06/27/11   Page 4 of 11

damages will be focused primarily on Rummer's life and the pain, loss, and grief suffered by his family and friends.

The parties agree that damages in this § 1983 action are governed by North Carolina's wrongful death statute, pursuant to 42 U.S.C. § 1988. See Bowling v. Oldham, 753 F. Supp. 588, 589-91 (M.D.N.C. 1990).[3] Plaintiff, invoking this statute, seeks damages for medical expenses, physical pain and mental anguish, lost earnings, and loss of consortium. See Compl. [DE 1] ¶ 74. Plaintiff also seeks punitive damages, alleging that Hudson was motivated by "a sense of personal ill will toward [d]ecedent" and/or that Hudson's conduct "was carried out with conscious and intentional disregard of and indifference to the rights and safety of [d]ecedent . . . ." Id. ¶ 76(c); see also Smith v. Wade, 461 U.S. 30, 56 (1983) (holding that punitive damages under § 1983 may be awarded where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.").

Hudson is correct that most or even all of the evidence related to medical expenses, lost earnings, and loss of consortium will be separate and distinguishable from evidence related to

---

[3] Under North Carolina's wrongful death statute, a decedent's estate is entitled to recover:

(1) Expenses for care, treatment and hospitalization incident to the injury resulting in death;
(2) Compensation for pain and suffering of the decedent;
(3) The reasonable funeral expenses of the decedent;
(4) The present monetary value of the decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected;
    a. Net income of the decedent,
    b. Services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered,
    c. Society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered;
(5) Such punitive damages as the decedent could have recovered . . . had he survived, and punitive damages for wrongfully causing the death of the decedent through malice or willful or wanton conduct . . . .;
(6) Nominal damages when the jury so finds.

N.C. Gen. Stat. § 28A-18-2(b).

5

liability. But as Hudson concedes, there will be some overlap between evidence regarding Rummer's pain and suffering prior to his death and liability. And the evidence relating to punitive damages, which involves an inquiry into Hudson's conduct, will presumably be indistinguishable from the evidence relating to liability and qualified immunity. In such circumstances, bifurcation of trial is not appropriate.

3.  Prejudice

Hudson also argues that failure to bifurcate trial will prejudice him. Much of this argument relies on the same underlying premise that qualified immunity entitles him to resolution of the issue at the earliest possible stage in litigation. In effect, Hudson argues that he will be prejudiced by facing unnecessary time, expense, and burden in litigating damages before the issue of qualified immunity has been resolved. Hudson also suggests that failure to bifurcate could lead to jury confusion, and that allowing such "damaging evidence" about the loss felt by Rummer's family and friends to be presented before liability is established is likely to inflame and prejudice the jury against Hudson.

The court discerns no prejudice inherent in the timing of the qualified immunity inquiry at this point in the litigation. As already discussed, it is assumed that a single trial will be more expedient than multiple trials, even in cases where qualified immunity remains as a defense. And although inflammatory evidence of loss of consortium could be prejudicial, see, e.g., Dixon, 990 F.2d at 1443, Hudson has not shown that this prejudice outweighs the prejudice that would accrue from "depriv[ing] plaintiff[] of [her] legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action . . ., replacing it with a sterile or laboratory atmosphere in which causation is parted from the reality of the injury," see In re Beverly Hills Fire Lit., 695 F.2d

6

207, 217 (6th Cir. 1982). Moreover, Hudson has not shown that a limiting instruction would be insufficient to cure any such prejudice.

   4.   Expediency in Possibly Eliminating Further Litigation

Finally, Hudson argues that bifurcation will economize judicial resources because a resolution of the qualified immunity issue in his favor would eliminate the need for litigation on the issue of damages altogether. It is true that "bifurcation may be appropriate where . . . the litigation of the first issue might eliminate the need to litigate second issue . . . ." See Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999). But where there is only one defendant and one claim to be resolved, and where trial of this matter is expected to last no more than two weeks, "the court cannot see how bifurcation of this action would result in greater convenience or expediency to the parties, the public, or the courts." See Snoznik v. Jeld-Wen, Inc., 2009 WL 929081, at *3 (W.D.N.C. Apr. 2, 2009).

In sum, Hudson has not shown that bifurcation is warranted due to concerns relating to convenience, prejudice, or economizing judicial and litigant resources. The court concludes that bifurcation of trial into liability and damages phases, or separate trials on these issues, would not be appropriate under Rule 42(b). Accordingly, Hudson's motion to bifurcate is DENIED.

B.   Special Interrogatories

The parties agree that resolution of the disputed facts relevant to the qualified immunity analysis should be "communicated [by the jury] in the form of answers to special interrogatories." See Mazuz v. Maryland, 442 F.3d 217, (Kelley, J., concurring), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); see also Willingham, 412 F.3d at 560 ("[T]he district court should submit factual questions to the jury and reserve for itself the legal question of whether

defendant is entitled to qualified immunity."). Because the court declines to bifurcate the issue of liability and damages, these special interrogatories will be submitted to the jury in the form of a special verdict under Rule 49 at the close of all the evidence. See Fed. R. Civ. P. 49(a)(1)(A) ("The court require a jury to return only a special verdict in the form of a special written finding on each issue of fact . . . [by] submitting written questions susceptible of a categorical or other brief answer."). The court has "wide discretion in fashioning appropriate inquiries" under Rule 49. Int'l Ground Trasp. v. Mayor & City Council of Ocean City, Md., 475 F.3d 214, 223 (Traxler, J., concurring).

In light of the parties' agreement, defendant's motion to submit special interrogatories is GRANTED. Although he parties disagree as to the wording and scope of the questions, this disagreement is not one which must be resolved prior to trial. Indeed, the evidence presented at trial will likely inform the specific factual disputes remaining. Nevertheless, the court believes it helpful to provide guidance to the parties and to allow an opportunity for further discussion of the proposed interrogatories at final pretrial conference approximately two weeks before trial. To that end, a rough draft of a proposed special verdict form is attached to this order.

## CONCLUSION

For the reasons set forth above, Hudson's motion to bifurcate trial (DE # 160) is DENIED, and his motion to use special interrogatories (DE # 162) is GRANTED.

SO ORDERED, this the ___ day of June, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge

# PROPOSED SPECIAL VERDICT FORM

Please answer each of the following questions. Note that these questions are not intended to limit your discussion of all of the relevant evidence. You need not answer each sub-question "yes" in order to answer the corresponding main question "yes." Likewise, you need not answer each sub-question "no" in order to answer the corresponding main question "no."

1. Did Rummer suffer from an objectively serious medical condition?  Yes \_\_\_\_\_  No \_\_\_\_\_

   A. Did Rummer's head hit the concrete floor as result of the takedown by Hudson?  Yes \_\_\_\_\_  No \_\_\_\_\_

   B. Did Rummer go to the ground "head first" (*i.e.*, without breaking his fall in any manner)?  Yes \_\_\_\_\_  No \_\_\_\_\_

   C. *Before* the takedown,

       i. Was Rummer bleeding above his eye?  Yes \_\_\_\_\_  No \_\_\_\_\_

       ii. Were Rummer's glasses broken?  Yes \_\_\_\_\_  No \_\_\_\_\_

       iii. Had Rummer urinated on himself?  Yes \_\_\_\_\_  No \_\_\_\_\_

       iv. Was Rummer unable to speak coherently?  Yes \_\_\_\_\_  No \_\_\_\_\_

       v. Was Rummer unable to walk?  Yes \_\_\_\_\_  No \_\_\_\_\_

       vi. Was Rummer screaming and/or yelling?  Yes \_\_\_\_\_  No \_\_\_\_\_

9

Case 7:03-cv-00244-FL Document 170 Filed 06/27/11 Page 9 of 11

C. *Following* the takedown,

    i. Was Rummer bleeding above his eye?      Yes \_\_\_\_ No \_\_\_\_

    ii. Were Rummer's glasses broken?      Yes \_\_\_\_ No \_\_\_\_

    iii. Had Rummer urinated on himself?      Yes \_\_\_\_ No \_\_\_\_

    iv. Was Rummer unable to speak coherently?      Yes \_\_\_\_ No \_\_\_\_

    v. Was Rummer unable to walk?      Yes \_\_\_\_ No \_\_\_\_

    vi. Was Rummer screaming and/or yelling?      Yes \_\_\_\_ No \_\_\_\_

D. Did Rummer suffer a head injury during the takedown by Hudson?      Yes \_\_\_\_ No \_\_\_\_

2. Did Hudson recognize Rummer's serious medical need?      Yes \_\_\_\_ No \_\_\_\_

    A. Did Hudson know that Rummer had suffered a head injury?      Yes \_\_\_\_ No \_\_\_\_

    B. Did Hudson observe Rummer's condition deteriorate?      Yes \_\_\_\_ No \_\_\_\_

    C. Was the substantial risk of harm to Rummer so obvious that even a layperson would easily recognize the necessity for a doctor's      Yes \_\_\_\_ No \_\_\_\_

3. Did Hudson act with deliberate indifference toward Rummer's serious medical need?

Yes _____
No _____

    A. Did Hudson tell Nurse Barfield that Rummer had not fallen?

Yes _____
No _____

    B. Did Hudson know that it was important for treatment purposes that Nurse Barfield know whether Rummer sustained a head injury?

Yes _____
No _____

    C. Did Hudson inform Nurse Barfield how Rummer sustained his injuries or that he had used force against Rummer?

Yes _____
No _____

    D. Did Hudson misrepresent critical medical information?

Yes _____
No _____

    E. Did Hudson recognize that his actions were inappropriate in light of the risk of harm to Rummer?

Yes _____
No _____

4a. Is Hudson liable for violating Rummer's federally protected rights?

Yes _____
No _____

4b. If so, what amount, if any, do you award plaintiff in compensatory damages?

$ _____

5a. Did Hudson act with evil motive or intent, or with reckless or callous indifference to Rummer's federally protected rights?

Yes _____
No _____

5b. If so, what amount, if any, do you award in punitive damages?

$ _____